Can I please the court? My name is Gary Proctor and I represent Terry Bowman. Unlike the previous cases I've been present for, I doubt we talk about case law at all. This case is entirely fact-driven. I think I cited a grand total of 12 cases in my brief. My mind got me beat but not by many. The only question really before this court is, was, I framed the same issue three different ways. Should the court have granted a new trial? Was the evidence sufficient? Should a rule 29 have been granted? Either way, was he guilty of aggravated identity theft? Again, even within the aggravated identity theft statute, it boils down to a very narrow issue of, did he know that Douglas Kahn was a real person? And did he know no later than that? Circumstantial evidence, admissible, could the court infer from all sorts of surrounding things, of course. Either way, was the evidence sufficient to show that he knew Douglas Kahn was a real person? Along those lines, wasn't the evidence that he was himself asked to provide his identification on the notion that this was going to be used as part of this scheme and wouldn't that lead someone logically to understand that this was part of the modus operandi of how this particular fraud scheme was being undertaken? Yes, he was himself asked and it appears the evidence was that he provided his own identification prior to cashing these checks from Douglas Kahn. That said, what's really important, Your Honor, is the main, there were two witnesses on this case, Mr. Akhil Asotu and I wasn't trial conscious. I'm sorry, can I, I'm so sorry, I just want to make sure I heard that right. Did you say that the evidence does show that he provided his identification before he cashed those checks? I thought your argument at trial was that the evidence didn't make the timeline clear. The evidence is at best wooly. That much is true. But, so the testimony was. Didn't he provide his own identifying information to be used in this scheme pretty early on in the scheme? He met Mr. Akhil Asotu three or four days later. They met again by chance at a gas station. They had a conversation. You want to make some money? Okay. Here's what I need in order to make some money. You know, driver's license, social security, whatever. And then three or four days later again, it appears in the testimony is I wasn't trial conscious. So I'm happy to. But you think a jury could reasonably credit that timeline? They could, but in the light most favorable. Now, whether the court could in a new trial motion, whether the weight of the evidence, which this court reviews under abuse of discretion, would lead to a different result is debatable. But here's why, even with that. Well, if it's debatable, then how is it an abuse of discretion? This court must look at the totality of the fact that we're combing through a 600-page joint appendix. Well, then what is your best evidence that he didn't know or should not have known? Thank you. That's a great question. My best evidence is twofold. One is Mr. Akhil Asotu, who provides the majority of the testimony on this. Mr. James talks about it a little. But it says, I didn't open the Douglas Conn account. Now, when we're talking about Mr. Bowman providing his identification with his numbers, that's for the Akhil Asotu fraud scheme. He's saying, if you do it my way, if you participate with me, if you partake in my fraudulent endeavors, here's what I do to open an account. And we're talking about him providing that is to open an account, which he subsequently does June, the summer of the next year. He opens T.B. Ventures, and the split was different for when you open an account as opposed. The evidence is uncontradicted that prior to June 2013, all Mr. Bowman was doing was cashing checks. Those checks were cashed. In fact, the first Douglas Conn one, the handwriting, the testimony was written by Friday James. They're providing it. Mr. Bowman's going to the banker. Actually, I think he went to the ATM machine. And he's putting it in the machine. I'm sorry, I don't quite understand. Is your point that the mere giving up of the ID is not enough from which you could infer knowledge? Is that what you're saying, that he gave up the ID for some other reason? He gave up his, the testimony was if you cashed a check, you got 20% of whatever, right? Let's say the check was $1,000, you got 200. If you opened an account on which fraud was perpetrated upon, you got more. You got more like I think 40% was the testimony. When he's providing his ID, that's I'm going to open a fraudulent bank account in my name. You think that it can't be inferred from that, that he understood that you needed a real identity to open these accounts? For two reasons. Yes, correct. Okay, why not? Reason number one is that Mr. Akhil and Sotu didn't open the Douglas Conn account. So the fact that Mr. Akhil and Sotu did it this way, and he's explaining here's how I make money, that he specifically said, he says at 261 and again at 262 of the joint appendix. I didn't open that one. Okay, so you're saying all you can tell from this is that the defendant knew this one guy when he opens up these sham bank accounts uses real IDs, but maybe there's another way to do it, and maybe they did it a different way on this other account. It's not even maybe, Your Honor, because at one point there was again testimony in the joint appendix that Mr. Bowman was given a fake ID, and he tried to use it, and he was unsuccessful in that. So there's not a one size fits all. You can't assume because you open this one this way, provide this information, that these checks that are already being procured were done the same way. And I want to bring the Court's specific attention to page 262 of the joint appendix. And I looked through the government's brief. They don't even cite to it. If they did, I missed it. But the question is, so do you remember when you told Mr. Bowman, this is cross-examination of Mr. Akhil Sotu, if you did tell Mr. Bowman that the identity Douglas Kahn was a real person, it's right at the bottom of page 262 of the joint appendix. Page 261, the page before, arguably they're talking about what happened at the petrol station. That's what Ms. Fine says, and it's debatable. Page 262, the very next page, I don't think there's any ambiguity here at all. If you did tell Mr. Bowman that Douglas Kahn was a real person, that's the question. And the answer, no, no, no, no, no. I wasn't the one that opened Douglas Kahn. We just had them cashing money. We just had them cash checks. That's the, Friday James, the only other person, at page 309 of the joint appendix, says, the question was, what's the effect of, did he ever understand that he was not using real IDs? It wasn't very artfully crafted. But the answer was, no, he didn't say anything. So Friday James' testimony is, I don't know one way or the other whether he knew he was using the real names of real people. But on page 262 of the joint appendix, I wasn't the one that opened it. We just had them cashing money. So from that, I submit, there is no inference this court can make. Whether we talk about a new trial, which is traditionally seen as the less draconian relief that this court can grant, because the government does get another bite at the apple, so to speak, if this court were to grant it. There's just, there's no evidence before this court. Well, I think the government's going to respond to that by pointing to other sections of the JA that tend to show the opposite of what that testimony suggests. And in the end, what we have, at least from the government's point of view, is a conflict in the testimony. And both the jury and the district court judge resolve that conflict against your client. How can that possibly be wrong? I understand your point. And what's really difficult to keep in mind here is the timeline of the events. By the summer of 2013, it's abundantly clear what Mr. Bowman knows. He's bringing his brother into the operation. He's opening TB Ventures. He's cashing checks on it. He's signing checks on it. But again, you can't retroactively, you know, the judge gave a willful blindness instruction that talks about mere hindsight isn't enough for willful blindness. You have to, you know, so the government's response, you know, it would be nice if they would delineate what he knew by the time the last one was cashed, which was November 2nd. I think they do delineate that. I mean, I read the hearing in front of the district court judge. I thought they walked through the timeline really specifically. And you seem to be saying today that their timeline holds up. I mean, they go through very specifically. And I'm going to forget the dates. There were no dates. But that, you know, you start with the fact that James opened the account. And by the time James was working with the defendant, the defendant was already working. Yes. And that he testified that he did fill the defendant in on how the operation works and that the defendant must have understood because he gave up his own ID documents to use. And they were able to piece it together. So when you add in the three days, the four days, it all must have happened before the end, at least, of that period when he's cashing the checks. And again, in the light most favorable to the government, it's a rational trier of fact could determine that he knew how the Akin Lasoto fraud scheme worked. He knew how the Akin Lasoto stroke Bridie James fraud scheme worked. But I keep coming back to the I didn't open that account. I don't know how it was opened. I don't know anything about it. I just know I had these checks and they worked. So, you know, and the case is cited by the government. I just wanted to briefly delineate this. Birth certificate, Social Security, driver's license. There's one case they cited where they talk about probably must have known it was a real document because there was a hologram on it. You know, anyone with QuickBooks can create these checks. So there isn't that presumption that we have in other cases that because you have a check, it must be from a real person. You know, we distinguish these cases. The government talks about the Realty Act and the response or I forget the name of the statute. First of all, I didn't know there was or know your customer. That's the word I'm looking for. I didn't know it until I read these pleadings. And second of all, when you've got Mr. Bowman, who the pre-sentence report that's in the sealed joint appendix makes ice cream. You know, it's a stretch at best to say he must have known. This court should have inferred that it because he has these checks that Douglas Kahn's a real person. So unless the court has any more questions, you know, it's a detailed factual issue. I can tell that you're all intimately familiar with it. I'll sit down and reserve the rest of my time. Before you sit down, are you raising a sentencing argument or no? I'm just going to submit on the pleadings if that's acceptable to the court. If you'd like to talk about it, we can. But I want to know if you're conceding. Okay. I'm not conceding, but I really didn't plan to address it. And I told Ms. Fine as such as well. Thank you, Mr. Brock. Good morning, Your Honor. My name is Tamara Fine. I am representing the United States today. I was also trial counsel. So I'm responsible for the awkwardly phrased or crafted questions that were referred to earlier. This is all about timing, as Judge Harris indicated. And timing can be done, can be displayed by having dates. But it can also be determined and put into evidence in terms of sequences of when events happen. And what we know is this based upon the record. That Mr. Atkin Lesotho met Terry Bowman when he borrowed him as a worker to cash checks. That wasn't part of somebody else's scheme. That was part of Mr. Atkin Lesotho's scheme. There's really only one scheme. Three or four days later, Mr. Atkin Lesotho met the defendant at a gas station. And he spoke to him long enough to realize that they should speak further about potential business. They exchanged phone numbers. And then three to four days after that, Mr. Bowman gave Mr. Atkin Lesotho a copy of his Maryland identification with his social security number on it to use in the scheme. And Mr. Atkin Lesotho testified looking at JA 143, 214, 216 to 17, 253. He testified that during that period of time between when they met at the gas station and when Mr. Bowman indicated his understanding of how the scheme worked by providing a copy of his own ID, they spoke about how unhappy Mr. Bowman was with the financial compensation he was getting from his prior fraud employer, Timmy, talked about how the scheme worked. They talked about the use of identities. And they talked about whether Mr. Bowman would agree to let his identity be exploited in the scheme. And so what you have there from the first day that he met Mr. Bowman when he was borrowing him in order to have him cash checks, you have a period of three to four days, let's say four days to be generous, before they met at the gas station. And then another four days, again, to be generous, before Mr. Bowman indicated he understood the scheme, understood IDs were used to open these accounts, and provided his own. And that's eight days. Now, he didn't go and start cashing the checks on the Douglas Conn account at day one when he met with Mr. Akinosoto. Speaking of the Douglas Conn account, Mr. Proctor pointed us to JA262 where Mr. Akinosoto appears to deny that he, at least, was involved with opening a Douglas Conn account. Yes, Your Honor. And how do you factor that into your argument? Well, as I said, it's all one scheme. In some cases, they did not have accounts to use to run their fraudulent deposits through. And so they borrowed accounts. Douglas Conn is a borrowed account. Sometimes they didn't have the workers, so they borrowed workers. And Timmy loaned them workers, loaned them Mr. Bowman, for example. They are all accounts that were used within the same scheme. And the fact that Mr. Akinosoto indicates on a couple of occasions that he didn't open the Douglas Conn account does not mean that he did not convey to Mr. Bowman that they used real accounts, that they had to use real accounts in order to open, excuse me, real people in order to open the accounts that were used in the scheme wherever they were sourced. And in addition to Mr. Bowman providing his own real information as a part of the scheme, I thought I recalled somewhere in the record that Mr. Bowman also provided identification of friends of his. Is that accurate? Mr. Bowman was interested in earning more money. And so over the course of the first few months, he sort of extended what he did. First, he allowed his own identity to be used. And both Mr. James and Mr. Akinosoto indicated that there was another Terry Bowman account other than TB Ventures that we frankly just never found. And they couldn't remember the name of the corporation that was founded. So you have a period of time when they're working on that account. And then they have the second account, TB Ventures, that is used, is opened with Mr. Akinosoto's identity. And then as Mr. Akinosoto said, you really can only open a couple of businesses and a few accounts on each of them before the banks start getting wise to the fact that you're opening a lot of business accounts and that they're going bust eventually. And so at that point, Mr. Bowman brought in his brother, Kenneth Bowman, who also provided his identity, created two corporations and one trade name registration for Con Edison. That was the check cashing that got Kenneth Bowman arrested. Terry Bowman was present at the bank with them. And he also provided a couple of these workers. I mean, the bottom line is throughout the testimony of Mr. Akinosoto and Friday James, you see that they were constantly looking for inputs into their scheme. They needed people to cast checks. Sometimes they had to borrow them. They needed people to open these accounts because otherwise sometimes they had to borrow them. And the significance of that, Mr. Akinosoto is absolutely clear about. The significance of that is money. If you borrow someone's workers, you have to give them a cut. If you borrow someone's bank account, you have to give them a cut. And so that's why they were eager to have it all done within the people who were under their control so that they would not. I'm sorry, I didn't mean to interrupt you, but just this whole thing reminds me that there's so much evidence of knowledge later on in the scheme. So how did we come to care only about this 13-day period in the fall of 2012 when that's sort of the government's toughest time to show this knowledge? Was that the only predicate? No, Your Honor. And had I this to do over again with hindsight, I probably would have added additional aggravated additional accounts of bank fraud and aggravated identity theft. This was the only account that was. This is the only account as to Mr. Bowman in the indictment. And it was chosen, frankly, because we liked the fact that this was a true victim. That is, someone whose identity was used as opposed to a complicit co-conspirator whose identity was being used. This was by far sort of the hardest time. And it did strike me that even the district court, when the hearing opens, says, I don't see any evidence of knowledge at that time period. There's plenty later on, but I don't see it in this time period. I don't think the district court said they didn't see any. They just said they're troubled. Evidence of knowledge at that point in time. Those were the first words out of the district court. And the district court came around, I'm sorry, and ruled for you in the end. But it wasn't easy. No, it isn't. And it's not easy because we're talking about a trial four years after these events. And we don't have dates. So obviously, it is a tougher case than it had to be. And again, I take responsibility for that. I was the person who guided it and lesson learned that I'll indict more counts of aggravated identity theft in future cases. I think the other thing to remember is that there's not just this direct evidence. And we've got direct evidence. We've got testimony of Atkin Lasotho, testimony of Friday James. But we also have indirect evidence or circumstantial evidence that, in fact, Mr. Bowman knew. And one piece of that is Mr. Bowman handing over his ID, the photocopy of his ID with more PII written on it. But you also just have the fact that Mr. Bowman had multiple bank accounts. And we know that from the testimony of Rachel Nicely, the postal inspector who had previously been a security officer for CQ. And she talked about, went through the documents for his, Mr. Bowman's applications for various accounts for TV Ventures and pointed out where in the documents you can see that he had an account at TV. He had an account at Bank of America. He didn't have to use his thumbprint to make transactions at Bank of America because they already had it on record he was a customer. And so you have the fact that Mr. Bowman was involved in banking generally. And you also have the fact that Mr. Bowman was involved in fraud. He was involved in fraud because he had been working for Timmy doing another one of these check cases. And so when you look at the Clark case, which I know the defense has cited or the appellant has cited as supporting them, I think it actually supports the government. The 8th Circuit held that a defendant's ability to deposit checks and make withdraws of funds from those accounts evidences knowledge that he was using the means of identification of a real person and that a reasonable juror could infer that the defendant, being a bank account holder and a prior perpetrator of identity theft, knew that banks opened accounts and give credit only to real people. So that case is exactly on point in the sense that Mr. Bowman was an account holder. Mr. Bowman was in fact a prior identity theft individual. And so he had knowledge that could be attributed to him. Circumstantial evidence that he must have known. Now, that's obviously not all we have. But when you look at the direct evidence in the context of that circumstantial evidence, it becomes quite a compelling case. That in fact, in this case, Mr. Bowman knew before he, probably before he cashed the first Douglas contract, but irrefutably before he cashed the last. That in fact, this was a scheme in which real identities had to be used to open bank accounts associated with those real people in order to successfully perpetrate the scheme. Unless the court has other questions for me? Thank you, Ms. Fung. Thank you. I don't have an awful lot to add. The court's clearly read the briefs, the underlying opinions, the ruling in the district court. I just wanted to point out briefly that the testimony from both Mr. Akamasoto and Mr. James was this was on a need-to-know basis. That was their testimony. Mr. James, in fact, said, me and he called him Tunde, we were like brothers. They'd been doing this scheme for more than a decade, I think, when the defendant came along. And I was on a need-to-know basis. Because if you have the people that can cash the checks, you can steal them. If you have the means of making a fake identity, you know, you don't want to share that with someone else. It's compromise for one, it's compromise for both. If you have social security numbers of Judge Diaz, you don't want to share that with someone else, because if they burn that social security number, you can't use it either. That was the testimony. It was on a need-to-know basis. And so within three or four days of meeting Mr. Bowman, Mr. Akamasoto gives up the keys to the kingdom and says, well, let me tell you about Douglas Kahn. He's a real guy. He lives wherever he lives. He's got good credit. We've opened this account. We've been feeding money back and forth, doing transaction shadowing one another so that it's seasoned. Now's the time. Let's get in. Let's cash three checks in eight days before someone figures this out. That's not supported by the testimony. It's not a reasonable inference from the facts. And while Mr. Bowman needed to know a lot more later, it's a fair inference from the facts, especially when the court looks at the weight of the evidence for a new trial motion that all he was told was, hey, I need your ID, and all I need you to do is go deposit these in the ATM for a bank account you already have. That's a fair inference. That's what this court should conclude. Ms. Fine talks about how this was all one scheme. There's no evidence, really, of how the Douglas Kahn account came into existence, other than Mr. Ackerman-Soto didn't do it. I don't think this court can make that conclusion from the record before it. And I just wanted to remind the court again, we talked, or you talked with Ms. Fine a little bit about bringing friends of his in, his brother, in fact, and other friends. All of that happened much, much later. You know, the prescient point of why didn't you charge some of the later stuff was not lost upon me, either. But here we are talking about something that happened prior to November 2, 2012, when Mr. Bowman, at that point, all the evidence showed, had just dipped his toe in the water to identity theft. It could have been charged when it was waist deep, neck deep, later in the summer of 2013, but it wasn't. So on those records, I would submit that the court should reverse the judgment, grant a new trial in respect of CUNT 15, aggravated identity theft. Unless the court has any further questions, thank you for your time. Mr. Proctor, before you sit down, I want to, on behalf of the court and my colleagues, note that you're court-appointed, and we are thankful, grateful for your service. We could not do what we do without having lawyers such as you take on this task. So thank you very much. You're most welcome, sir. All right, we'll come down and re-counsel and proceed to our final case.
judges: Albert Diaz, Stephanie D. Thacker, Pamela A. Harris